**APPEAL NUMBER: 25-13896**
**UNITED STATES COURT OF APPEALS**
**FOR THE ELEVENTH CIRCUIT**

---

**AMANDA FENNEL,**

**Plaintiff-Appellant,**

**v.**

**ELMORE COUNTY BOARD OF EDUCATION,**

**Defendant-Appellee.**

---

**ON APPEAL FROM THE UNITED STATES**
**DISTRICT COURT FOR THE MIDDLE DISTRICT OF ALABAMA**

---

**BRIEF FOR PLAINTIFF-APPELLANT**

**Jon C. Goldfarb**
**L. William Smith**
Wiggins, Childs, Pantazis, Fisher,
& Goldfarb, LLC
The Kress Building
301 North 19th Street
Birmingham, Alabama 35203
(205) 314-0500
**Attorneys for Plaintiff-Appellant**

**Certificate of Interested Persons**

Pursuant to 11th Cir. R. 26.1, undersigned counsel certifies that the following persons have an interest in the outcome of this matter:

1. Ball, Ball, Matthews, & Novack, P.A., Counsel for Voluntarily Dismissed Defendants;

2. Dennis, Laura, Voluntarily Dismissed Defendant;

3. Dennis, Richard, Voluntarily Dismissed Defendant;

4. Doyle, Hon. Stephen, United States District Court Magistrate Judge for the Middle District of Alabama;

5. Elmore County Board of Education, Defendant-Appellee;

6. Fennel, Amanda, Plaintiff-Appellant;

7. Goldfarb, Jon C., Attorney for Plaintiff-Appellant;

8. Hill, Dana B., Attorney for Defendant-Appellee;

9. Hill, Hill, Carter, Franco, Cole & Black, P.C., Counsel for Defendant-Appellee;

10. Huffaker, Honorable R. Austin., Jr., United States District Judge for the Middle District of Alabama

11. Malmat, Christina M., Attorney for Plaintiff-Appellant;

12. Marsh, John W., Attorney for Voluntarily Dismissed Defendants;

13. Slater, Robbie, Voluntarily Dismissed Defendant;

14. Smith, L. William, Attorney for Plaintiff-Appellant;

15. Wiggins, Childs, Pantazis, Fisher, & Goldfarb, LLC., Counsel for Plaintiff-Appellant;

## Statement Regarding Oral Argument

Oral argument is requested and necessary. All of the issues in this appeal require oral argument because: (l) the appeal is not frivolous; (2) the facts and legal arguments cannot be adequately presented in the briefs and record; and (3) the decisional process will be significantly aided by oral argument.

## Certificate of Type Size and Style

Pursuant to Eleventh Circuit Rule 28.1 (d) the following is the type size and styled used in this brief: Times New Roman 14 pt.

**Table of Contents**


Certificate of Interested Persons…………………………………………………2

Statement Regarding Oral Argument………………………………………….4

Certificate of Type Size and Style……………………………………………5

Table of Contents…………………………………………………………………...6

Table of Authorities……………………………………………………………...9

Table of Record References in the Brief…………………………………..11

Statement of Subject Matter and Appellate Jurisdiction……………………….16

Statement of the Issues……………………………………………………17

Statement of the Case……………………………………………………..18

Course of Proceedings Below……………………………………...18

The Trial Court's Summary Judgment Disposition………………………...19

I. Plaintiff's Statement of Facts……………………………………………23

A. Background and Plaintiff's Employment with Defendant…………..23

B. Defendant's Work Rules and Policies Apply to Tenured and Non-Tenured Employees…………………………………………….23

C. The March 8, 2022 Incident………………………………………….24

D. Plaintiff's Job Required Her to Spend Time Alone with Bell……….28

E. Bell's History of Sexually Harassing Women and Girls and Blaming Racism When Confronted with Allegations of Improper Conduct….29

F. Principal Slater Falsified a Document to Make it Appear Plaintiff Had Been Previously Warned About Being Alone with Bell…………….35

G. Defendant Terminated Plaintiff Allegedly for Being in a "Compromising Position" Alone Behind Closed Doors with Bell....37

H. Defendant Did Not Terminate Males Accused of Similar Conduct...40

Scope of Review.........................................................................42

Summary of Argument.................................................................43

Argument and Citations to Authority..........................................44

I. The Court Should Erred in Granting Summary Judgment Under Plaintiff's Sex Discrimination Theory of Relief..........................................44

A. A Reasonable Jury Could Find that Plaintiff's Sex Was at Least a Motivating Factor in Her Termination, Even if Other Factors Also Motivated that Decision..................................................44

(1) A Reasonable Jury Could Infer Discrimination from Defendant's Focus on the "Compromised Position" of a Female Administrator Alone with a Male Colleague....................46

(2) A Reasonable Jury Could Find that Bell, Including as an Untenured Administrator, Received More Favorable Treatment Despite Repeatedly Engaging In "Intimate, Inappropriate Behavior" in the Workplace........................................50

(3) Plaintiff Has Identified Other Male Comparators Who Were Treated More Favorably.........................................59

(4) A Reasonable Jury Could Infer Discriminatory Intent from Defendant's Tolerance of Sexual Harassment..................60

(5) A Reasonable Jury Could Infer Gender Discrimination from the Evidence of Pretext In Principal Slater's Fabrication of a Memo to Make it Appear that Plaintiff Had Been Warned about Bell...........................................................62

B. The Court Erred in Granting Summary Judgment on Plaintiff's Race Association Theory of Relief…………………………………………..66

Conclusion……………………………………………………………………...71

Certificate of Compliance………………………………………………………72

Certificate of Service…………………………………………………………...73

**Table of Authorities**

*Bostock v. Clayton Cty.*,
590 U.S. 644, 656-60 (2020)……………………………………………49

*Hall v. Ala. Ass'n of Sch. Bds.*,
326 F.3d 1157, 1165 (11th Cir. 2003)………………………………………44

*Ismael v. Roundtree*,
Case No. 24-10604, 2025 U.S. App. LEXIS 31896 at *15-16, 19-20 (11th Cir. 2025) ……………………………………………45, 47, 53, 57, 63, 65

*Jenkins v. Nell*,
26 F. 4th 1243, 1251 (11th Cir. 2022)…………………………50, 57, 60, 70

*Joseph v. Bd. of Regents of the Univ. Sys. of Ga.*
121 F.4th 855, 871 (11th Cir. 2024)………………………………………..67

*Lathem v. Dep't of Children & Youth Servs.*,
172 F.3d 786, 793 (11th Cir. 1999)…………………………………………57

*Lewis v. City of Union City*,
918 F.3d 1213, 1226, 1226 n.10, 1227 (11th Cir. 2019)………..50-52, 56, 70

*McCreight v. AuburnBank*,
117 F.4th 1322, 1335 (11th Cir. 2024)…………………………………45, 62

*McDonnell Douglas Corp. v. Green* (1973)……………………19, 44, 50, 56, 62

*Muldrow v. City of St. Louis,*
601 U.S. 346, 350, (2024)…………………………………………………58

*Parr v. Woodmen of the Life Insurance Co.,*
791 F.2d 888, 891, 892 (11th Cir. 1986)……………………………..66-67

*Reeves v. Sanderson Plumbing Prods.,*
530 U.S. 133, 147 (2000)……………………………………………….62

*Smith v. City of New Smyrna Beach,*
588 F. App'x 965, 976 (11th Cir. 2014)……………………………………60

*Smith v. Lockheed-Martin Corp.,*
644 F.3d 1321, 1344 (11th Cir. 2011)……………………………………69

*Stardust, 3007 LLC v. City of Brookhaven*,
899 F.3d 1164, 1170 (11th Cir. 2018)……………………………………42

*Staub v. Proctor Hosp*.,
562 U.S. 411, 419, 420 (2011)…………………………………………58, 62

*Tynes v. Fla. Dep't of Juv. Just.*,
88 F. 4th at 947……………………………………………………………..53

*Walker v. St. Joseph's/Candler Health Sys*.,
506 F. App'x 886, 889 (11th Cir. 2013)………………………………….51

*Whitney v. Greater New York Corporation of Seventh Day Adventists*,
401 F. Supp. 1363, 1365 (S.D.N.Y. 1975)…………………………...66-67

**<u>Statutes & Other:</u>**

28 USC §1331………………………………………………………………16

28 USC §1343………………………………………………………………16

42 U.S.C. Section 2000e……………………………………………………..18

42 U.S.C.S. § 2000e-2………………………………………………………44-45

2018-2019. Ala. Code §16-24C-4(1)………………………………………...23

Fed. R. App. P. (32)(a)(7)(B)………………………………………………...72

Title VII of the Civil Rights Act of 1964…………………………………18, 22, 66

**Table of Record References in the Brief**

| **Brief Page No.** | **Filing** | **Docket No.** |
|---|---|---|
| | Docket Sheet | A |
| 18 | Complaint | 1 |
| | Answer of Defendant Elmore County Board of Education | 15 |
| | Amended Answer of Defendant Elmore County Board of Education | 18 |
| 18 | Pro Tanto Stipulation of Dismissal | 37 |
| 18 | Order Dismissing Individual Defendants | 38 |
| 18 | Defendant's Motion for Summary Judgment | 47 |
| 18 | Defendant Elmore County Board of Education's Brief in Support of Its Motion for Summary Judgment | 48 |
| 18 | Evidentiary Submission in Support of Defendant Elmore County Board of Education's Motion for Summary Judgment | 49 |
| 24, 56 | Defendant's Exhibit G in Support of Defendant's Motion for Summary Judgment, Code of Ethics | 49-6 |
| 26 | Defendant's Exhibit J in Support of Defendant's Motion for Summary Judgment, Amanda Fennel Statement | 49-9 |
| 35-36, 38, 48, 63-64 | Defendant's Exhibit O in Support of Defendant's Motion for Summary Judgment, Robbie Slater Directives | 49-14 |

| | | |
|---|---|---|
| 27 | Defendant's Exhibit P in Support of Defendant's Motion for Summary Judgment, Paid Administrative Leave Letter to Fennel | 49-15 |
| 27 | Defendant's Exhibit Q in Support of Defendant's Motion for Summary Judgment, Proposed Notice of Termination to Fennel | 49-16 |
| 27 | Defendant's Exhibit R in Support of Defendant's Motion for Summary Judgment, Letter of Termination to Amanda Fennel | 49-17 |
| 33, 35, 38, 49, 54, 61, 68 | Defendant's Exhibit T in Support of Defendant's Motion for Summary Judgment, Proposed Notice of Termination to Bell | 49-19 |
| 38 | Defendant's Exhibit V in Support of Defendant's Motion for Summary Judgment, Assistant Principal Job Description | 49-21 |
| | Plaintiff's Motion to File Under Seal | 53 |
| | Text Order Granting Plaintiff's Motion to File Under Seal | 54 |
| 18 | Plaintiff's Opposition to Defendant's Motion for Summary Judgment | 55 |
| 18 | Plaintiff's Evidentiary Submission | 56 |
| 23-28, 35-36, 48, 54, 58, 63-65, 70 | Plaintiff's Exhibit 1 in Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment, Amanda Fennel Deposition Excerpts | 56-1 |
| 23, 27-29, 31-34, 36, 49, 54, 56, 63, 68 | Plaintiff's Exhibit 2 in Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment, Robbie Slater Deposition Excerpts | 56-2 |

| | | |
|---|---|---|
| 23, 26, 29-31, 33-34, 36-38, 45-46, 49, 61, 63, 68 | Plaintiff's Exhibit 3 in Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment, Susanne Goodin Deposition Excerpts | 56-3 |
| 23, 25-29, 32-33, 36, 39, 45, 48, 50, 54, 56, 58, 64, 68-69 | Plaintiff's Exhibit 4 in Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment, Rahman Bell Hearing Transcript Excerpts | 56-4 |
| 24, 56 | Plaintiff's Exhibit 5 in Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment, Elmore County BOE Policy Manual | 56-5 |
| 24, 56 | Plaintiff's Exhibit 6 in Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment, Elmore County Administrative Road Map | 56-6 |
| 29-31, 33, 50, 54, 61 | Plaintiff's Exhibit 7 in Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment, PX 2, Bell Statements | 56-7 |
| 29, 31 | Plaintiff's Exhibit 8 in Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment, PX 3, Katie Hart Statement | 56-8 |
| 32-33, 49, 54, 56, 61, 68 | Plaintiff's Exhibit 9 in Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment, PX 7, Slater Directives (Bell) | 56-9 |
| 33, 36, 49, 54, 61, 63, 68 | Plaintiff's Exhibit 10 in Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment, PX 1, R. Dennis Letter of Concern | 56-10 |
| 37 | Plaintiff's Exhibit 11 in Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment, Notification of Proposed Action | 56-11 |

| | | |
|---|---|---|
| 33, 61 | Plaintiff's Exhibit 12 in Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment, PX 6, Statements | 56-12 |
| 26, 34, 61 | Plaintiff's Exhibit 13 in Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment, Laura Dennis Deposition Excerpts | 56-13 |
| 34 | Plaintiff's Exhibit 14 in Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment, PX 14, WHS Incident | 56-14 |
| 35 | Plaintiff's Exhibit 15 in Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment, Rahman Bell Charge of Discrimination | 56-15 |
| 37, 45-46 | Plaintiff's Exhibit 16 in Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment, PX 18, Elmore County BOE Supplemental Discovery Responses | 56-16 |
| | Plaintiff's Exhibit 17 in Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment, PX 24, Personnel Disciplinary Actions 2017-2018 (filed under seal as Doc. 57-1) | 56-17 |
| 38-39, 45-46, 50, 65 | Plaintiff's Exhibit 18 in Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment, Richard Dennis Deposition Excerpts | 56-18 |
| 40, 59 | Plaintiff's Exhibit 19 in Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment, Kenith Burdett Documents | 56-19 |
| 40-41, 59 | Plaintiff's Exhibit 20 in Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment, Roman Zeigler Documents | 56-20 |

| | | |
|---|---|---|
| 23, 54 | Plaintiff's Exhibit 21 in Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment, Rahman Bell Offer Letter | 56-21 |
| 58 | Plaintiff's Exhibit 22 in Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment, PX 11, Letter of Response | 56-22 |
| 18 | Plaintiff's Notice of Filing Exhibits Under Seal | 57 |
| 37 | Plaintiff's Exhibit 17 in Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment, PX 24, Personnel Disciplinary Actions 2017-2018 | 57-1 |
| 18 | Defendant Elmore County Board of Education's Reply in Support of Motion for Summary Judgment | 58 |
| 18-22, 44, 47-48, 51-53, 55, 61, 63, 66-67 | Memorandum Opinion and Order | 59 |
| 18, 22 | Final Judgment | 60 |
| 18 | Notice of Appeal | 61 |

## Statement of Subject-Matter and Appellate Jurisdiction

The district court has subject matter jurisdiction pursuant to 28 USC §§1331 and 1343.

## Statement of the Issues

This case presents the issue of whether the trial court erred in granting summary judgment to Defendant on Plaintiff's claim for wrongful termination under theories of gender discrimination and associational race discrimination where Defendant treated Plaintiff's fellow assistant principal, Rahman Bell, an African American man, more favorably by allowing him to repeatedly sexual harass female teachers and students without consequence, but terminated Plaintiff, a white woman, after Bell's sexually harassing conduct placed her in a "compromised position."

## Statement of the Case

Plaintiff alleges that Defendant terminated her employment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section 2000e *et seq*., as amended.

## Course of Proceedings Below

Plaintiff filed her complaint on September 8, 2023 in the federal district court for the Middle District of Alabama, Northern Division, naming Elmore County Board of Education ("Board") on her claim for wrongful termination in violation of Title VII of the Civil Rights Act of 1964, as amended, under theories of gender discrimination and associational race discrimination. (Doc. 1). Plaintiff's complaint also asserted claims under Alabama state law against Principal Robbie Slater, Superintendent Richard Dennis, and Laura Dennis. (Doc. 1). Subsequently, Defendants Richard Dennis, Laura Dennis, and Robbie Slater were dismissed, leaving only Plaintiff's Title VII claims against the Board. (Docs. 37, 38).

Following discovery, the Board moved for summary judgment, Plaintiff responded, and the Board filed a reply brief, with both parties submitting evidentiary materials. (Docs. 47, 48, 49, 55, 56, 57, 58). On October 6, 2025, the Court issued its Memorandum Opinion and Order granting the Board's motion for summary judgment. (Doc. 59). The Court issued a final judgment on the same date. (Doc. 60). Plaintiff timely filed her notice of appeal on November 4, 2025. (Doc. 61).

**The Trial Court's Summary Judgment Disposition**

The trial court acknowledged that "Fennel proceeds under a mixed-motive theory of discrimination with circumstantial evidence" (Doc. 59 at 8) and correctly observed that in consequence, "Fennel is not required to satisfy the *McDonnell Douglas* burden-shifting framework." (Doc. 59 at 8). As to the "five categories of circumstantial evidence" advanced by the plaintiff, the trial court concluded that "[t]his circumstantial evidence identified by Fennel—taken separately or together—is insufficient to create a genuine issue of material fact as to whether Fennel's termination was motivated by her sex." (Doc. 59 at 9-10).

The trial court first addressed Plaintiff's evidence that sex discrimination can be inferred from the Board's concern "about a male and a female administrator spending time together behind closed doors." (Doc. 59 at 10). The trial court reasoned that contrary to Plaintiff's arguments, "the evidence shows that the Board's decision was motivated by Laura Dennis' observations and Superintendent Dennis' recommendation that Fennel and Bell should be terminated for their conduct at school." (Doc. 59 at 10). The trial court further reasoned that "[a]t most, the Board member's reference to the parties' sex … is a 'stray remark' largely unconnected to the decision-making process," even though the Board members' discussion of Plaintiff's gender occurred on the record during the Board's hearing on whether to terminate Bell's employment. (Doc. 59 at 11).

Addressing Plaintiff's comparator evidence, the Court acknowledged that "[t]he record does reveal that Slater gave Bell multiple warnings after Bell repeatedly placed himself in compromised positions with other staff members and students" and that "Bell engaged in 'intimate, inappropriate behavior,' including making inappropriate comments to teachers, touching teachers on the arm and shoulder, and having women and girls visit his office for extended lengths of time without an apparent reason." (Doc. 59 at 12-13). The trial court further found that Bell had been treated more favorably than Plaintiff: "that Slater did not refer Bell for discipline until the March 8, 2022 incident with Fennel; and that by contrast when Slater was confronted with evidence that Fennel placed herself in a 'compromised' position, he immediately reported the misconduct to Goodin and the Board." (Doc. 59 at 13). Nonetheless, the Court concluded that "Slater's treatment of Bell's prior misconduct is not proper comparator evidence because it involved different kinds of misconduct" because "in none of those prior incidents was Bell observed adjusting his clothing after being discovered alone with a colleague behind closed doors." (Doc. 59 at 13). In spite of Slater having treated Bell more favorably despite numerous episodes of inappropriate conduct, the Court concluded that "when Bell was found alone with Fennel in his office, he was subject to the *same* discipline—termination—as Fennel for the same primary misconduct. This, Slater's treatment of Bell actually supports the Board's argument that Fennel's termination was *not*

motivated by sex." (Doc. 59 at 13). The court similarly dismissed two other comparators, Ken Burdett and Roman Zeigler, whom the Court found "were accused of public touching, making inappropriate comments, and taking an inappropriate picture of a colleague." (Doc. 59 at 13-14). The Court's basis for dismissing these comparators was that "unlike here, they were not found in close proximity in a compromising position behind closed doors during school hours and during a student emergency." (Doc. 59 at 14).

The Court further found that a reasonable jury could not infer sex discrimination from the Board's tolerance of sexual harassment. (Doc. 59 at 14). The Court reasoned that "Goodin and the Board were unaware of the prior allegations made by students and teachers against Bell until after Goodin began her investigation of the March 8, 2022 incident." (Doc. 59 at 15).

Addressing Plaintiff's evidence of pretext in Slater's fabrication of a memo to make it appear Plaintiff had been warned about being alone with Bell, when in fact no such conversation ever occurred, the Court reasoned, "[a]ssuming the falsity of Slater's statement about their September 2021 discussion, it does not sufficiently suggest pretext, if at all … here, Fennel does not dispute the *substance* of the reason cited by the Board for her termination—that she was seen alone with Bell in close physical proximity in the teacher's lounge in September 2021…" (Doc. 59 at 15).

Addressing Plaintiff's associational race discrimination claim, the trial court correctly rejected Defendant's argument that Plaintiff could not maintain an associational race discrimination claim because she denied the existence of any personal or romantic relationship with Bell, reasoning that "[t]he Board's interpretation is too narrow" and that "other courts have recognized Title VII claims premised upon casual social relationships." (Doc. 59 at 16).

However, the Court rejected Plaintiff's reliance on additional comparator evidence in the form of Slater's more favorable treatment of the other assistant principal, who is African American, reasoning that she was not sufficiently similarly situated to Plaintiff because "Slater did not receive reports about Bell and Eutsey from concerned colleagues or students" and because "holding hands or rubbing another's back in public view is very different than being discovered behind closed doors…" (Doc. 59 at 17). The trial court similarly rejected Plaintiff's argument "that Slater had incentive to terminate a white employee at the same time he terminated Bell because Bell had blamed earlier sexual harassment allegations on racism," and labeled such an inference as "pure speculation." (Doc. 59 at 18).

Based on this reasoning, the trial court granted Defendant's motion for summary judgment and entered final judgment for Defendant and against the plaintiff. (Doc. 59 at 18, Doc. 60).

## I. Plaintiff's Statement of Facts

### A. Background and Plaintiff's Employment with Defendant.

Defendant hired Plaintiff as an Assistant Principal at Wetumpka High School on or around July 17, 2021. (Doc. 56-1, 15:6-15). During her first three years of employment with Wetumpka, Plaintiff was a probationary employee without teacher tenure. (Doc. 56-1, 99:16-100:10).

At Wetumpka, Plaintiff, who is white, was one of three assistant principals, along with Benetta Eutsey and Rahman Bell, both of whom are African American. (Doc. 56-1, 30:21-31:7). Bell had primary disciplinary responsibility for students in 9th grade, Eutsey for students in 10th grade, and Plaintiff for students in 11th and 12th grades. (Doc. 56-1, 48:16-50:7). The principal at this time was Dr. Robbie Slater. (Doc. 56-2, 12:9-11). Susanne Goodin was Human Resources Director. (Doc. 56-3, 9:21-10:2).

Bell was first hired by Defendant for the 2015-2016 school year as a Special Education teacher. (Doc. 56-21; Doc. 56-4, 240:2-13). He thus became eligible for tenure in the fall of 2018-2019. Ala. Code §16-24C-4(1).

### B. Defendant's Work Rules and Policies Apply to Tenured and Non-Tenured Employees.

Defendant subjects tenured and non-tenured employees to the same work rules and policies and the same consequences for violating those work rules and policies. Defendant's employee handbook states "[t]he contents of this handbook

apply to all regular employees (certified and classified) and to all part time, temporary, and seasonal personnel in the School System..." (Doc. 49-6, p. 3). Among the policies that apply to all employees are the "Code of Ethics Standards" including the "Professional Conduct" Standard, which states that "Unethical conduct includes, but is not limited to … Harassment of colleagues or students" and "Inappropriate language or behavior on school grounds." *Id.* at 4. The Employee Handbook does not provide different standards for professional conduct depending on a teacher's tenured or non-tenured status. *Id.* Similarly, Defendant's Policy Manual does not differentiate between tenured or non-tenured employees in the application of its policies. (Doc. 56-5). Finally, Defendant's Administrative Roadmap makes no mention of tenured or non-tenured status being relevant to disciplinary decisions under Defendant's Progressive Discipline policy. (Doc. 56-6, pp. 12-13).

### C. The March 8, 2022 Incident.

On March 8, 2022, Plaintiff was walking back to her office after monitoring her hallway during class change and encountered fellow Assistant Principal Rahman Bell. (Doc. 56-1, 45:18-46:13, 15:6-11, 56:8-57:12). Bell's office phone had not been working; knowing this, Ms. Burchard, the technology coordinator, had called

Plaintiff earlier that day to give instructions on rebooting it, since Burchard was unable to call Bell directly on the broken phone. (Doc. 56-1, 50:14-51:22).[1]

Plaintiff told Bell that she had spoken with Ms. Burchard, and she walked with Bell to his office to show him how to reboot the phone. (Doc. 56-1, 47:9-19, 52:12-22, 58:3-7). Plaintiff also needed to retrieve her coffee and her walkie-talkie, which she had left there prior to the class change when she and Bell had searched a student for contraband. (Doc. 56-1, 51:23-52:8, 55:8-19). While waiting for the phone to reboot, she and Bell discussed a discipline case. (Doc. 56-1, 59:5-21, 65:10-21, 67:4-19).

Bell stood to get a drink out of his lunchbox, and Plaintiff noticed that his zipper was down and told him so. (Doc. 56-1, 62:3-15, 68:4-70:5). Bell then told her, "it's broken … he said it was broken down to where he couldn't fix it." (Doc. 56-1, 70:10-14). Plaintiff told Bell she had safety pins in her office, and Bell responded that he had a sewing kit. (Doc. 56-1, 70:15-71:2). Bell walked around his desk so that he was standing with his back to the door, with Plaintiff standing facing the door and him. (Doc. 56-1, 73:13-74:20). Plaintiff was pointing to where Bell needed to put the pin when the door opened and a young, newly hired teacher who had not yet completed her undergraduate degree, Laura Dennis, burst in, causing

[1] HR Director Goodin confirmed that she knew that Bell's phone was broken, and that the technology director had asked Plaintiff to tell Bell to unplug it and plug it back in. (Doc. 56-4, 155:16-157:1).

Bell to say, "Oh shit." (Doc. 56-1, 75:5-76:12, 119:17-120:7; Doc. 56-3, 18:1-19). Bell and Plaintiff were startled by the door being suddenly opened. (Doc. 56-1, 77:5-18). Although Laura Dennis's statement claims that Bell was "up against her," this is false, as Plaintiff and Bell were not standing close enough for Plaintiff to be able to touch him. (Doc. 56-1, 257:2-5, 289:10-290:3).

Dennis told Bell, "Mr. Bell we need you." (Doc. 56-1, 79:15-18; Doc. 49-9). Dennis specifically asked for Bell, not Plaintiff, by name. (Doc. 56-1, 79:19-80:3). The fight was on the ninth-grade hall, which was Bell's responsibility, while Plaintiff was responsible for eleventh and twelfth grade students, so Plaintiff remained in the office for a minute and a half gathering her coffee, her walkie-talkie, and the discipline referrals she and Bell had been discussing, while she made sure that the phone had finished rebooting. (Doc. 56-1, 49:6-50:13, 78:1-81:23). She then responded to the fight, arriving at the same time as the other Assistant Principal, Ms. Eutsey. (Doc. 56-1, 85:2-86:1, 188:22-189:10, 191:7-14). While Bell restrained one of the students involved in the fight, Plaintiff and Eutsey focused on dispersing the students that had gathered in the hall and returning them to their classrooms. (Doc. 56-1, 194:8-198:18). Because the fight was on Bell's hallway, Bell handled discipline for the students involved. (Doc. 56-1, 199:5-23).

Laura Dennis spoke to Principal Slater that same day. (Doc. 56-4, 29:10-18, 33:6-14; Doc. 56-13, 21:17-23:3). Meanwhile, Bell went directly to Principal Slater

and informed him that Dennis had walked in while he and Fennel were in the office, that his zipper was broken, and that he had used a curse word. (Doc. 56-4, 41:19-42:13). Slater observed that Bell's zipper was down. (Doc. 56-4, 44:8-14; Doc. 56-2, 131:21-132:6). During this conversation, Slater asked Bell, "[w]hy would you make the decision to do that with her," i.e. be alone in the office with Plaintiff discussing his broken zipper, "because of the past, you know, previous…" referring to Slater's awareness of a history of sexual harassment allegations and allegations of improper conduct against Bell. (Doc. 56-4, 54:13-55:2). Slater testified that Bell's response was that "it probably wasn't a good decision." (Doc. 56-4, 54:23-55:2). In this instance, unlike previous occasions where he had received reports about Bell engaging in inappropriate behavior in the workplace, Slater made the decision to refer the matter to HR Director Goodin at the central office. (Doc. 56-2, 131:12-134:24).

When Plaintiff was placed on administrative leave the next day, March 9, 2022, she testified, "I was in shock that I was getting accused of something." (Doc. 49-15; Doc. 56-1, 88:13-15). "I was not in the act of doing anything. I was standing. Standing … I was doing my job." (Doc. 56-1, 135:19-137:6). Plaintiff received notice on April 6, 2022 that Defendant was seeking to terminate her employment. (Doc. 49-16; Doc. 56-1, 160:11-161:11). Defendant terminated Plaintiff's employment effective May 24, 2022. (Doc. 49-17).

Defendant had a progressive discipline policy contained in its "administrative road map" at this time, but Defendant bypassed progressive discipline when it terminated Plaintiff without any previous disciplinary actions. (Doc. 56-4, 58:8-59:23; Doc. 56-2, 91:2-23).

### D. Plaintiff's Job Required Her to Spend Time Alone with Bell.

Plaintiff and Bell had a professional relationship, and it was common for her to seek his advice relating to discipline and other responsibilities because she had taken over some of Bell's responsibilities when she was hired. (Doc. 56-1, 48:5-15; Doc. 56-4, 234:14-235:1). As Dr. Slater testified at Bell's termination hearing, administrators have access to confidential information, and their job duties involve working together on sensitive issues relating to student conduct and student discipline. (Doc. 56-4, 56:14-58:7). Plaintiff's job as assistant principal thus required her to work closely with Bell, including spending time alone with him, particularly as Plaintiff was new to the job and had taken over some of Bell's former duties, as well as because she shared certain duties with Bell. *Id.* at 198:14-23. As Bell testified in his hearing, "there was a lot of organization that we were trying to get together to help her so she could, of course, be successful at it because, of course, she had lots of questions about it and, plus, she was just kind of, you know, not familiar with it." (Doc. 56-4, 199:8-17). Bell testified, "[t]here were multiple times that … she had to meet with me concerning students who may have qualified to be placed on PST and

the different teachers and responsibilities … so there was a lot of just kind of interconnecting that we also – we all had to do, both her and I." *Id.* at 199:18-200:1. Administrators also work sports games, where they are responsible for collecting and accounting for money received, and Bell worked a volleyball game with Plaintiff to show her how to do this. *Id.* at 230:1-231:2, 262:4-23. As Slater's testimony makes clear, Plaintiff and Bell also shared duties relating to student discipline, such as conducting searches for contraband and completing officer referrals, including on the morning of the incident in question in this lawsuit. *Id.* at 195:3-196:11. In sum, it would have been impossible for Plaintiff and Bell to do their jobs if they were not allowed to meet without other people being present. *Id.* at 226:17-228:4.

### E. **Bell's History of Sexually Harassing Women and Girls and Blaming Racism When Confronted with Allegations of Improper Conduct.**

The Principal, Dr. Slater, had received numerous disturbing complaints by female teachers about Bell sexually harassing them as early as 2016, including reports of Bell engaging in "public displays of 'affection'" with young female teachers and students and Bell inappropriately touching students, including sticking his hand in a hole in a student's jeans above her thigh. (Doc. 56-7; Doc. 56-8; Doc. 56-2, 96:13-105:6; Doc. 56-3, 49:18-50:12). In 2017, prior to Bell being eligible for tenure, Slater was informed by a female teacher of the following behavior:

> A new, very young, teacher had been hired and was placed in the classroom at the start of C Hall. Her and Mr. Bell formed a seemingly

> immediate, close friendship, which was no concern of mine […] However, soon their friendship started to include public displays of "affection." When the teacher would stand at the end of the hall with Mr. Bell, they would often touch—whether by touching hands, touching each other's legs, hugging, putting a head on the shoulder, etc. They were, what most would consider, openly flirtatious. Soon, students began to notice their interactions and ran with it […]
>
> In addition to the situation with the new teacher, it seemed like female students were becoming especially friendly and "touchy feely" with Mr. Bell – to the point that it was making teachers on the hall uncomfortable. Female students were making claims about having private conversations with him outside of school and were very vocal about it, some even claiming to have sexual conversations […] One example that sticks out in my mind is when a student was sent to him before first period for a dress code violation. She had holes in her jeans above the knee. He was standing at the end of the hall, and teachers were standing at their doors, waiting for the bell to ring. When the student approached him about the dress code violation, **he stuck his hand in the hole in her jeans which was above the thigh**. He was pointing out how egregious the hole was, but the touching made teachers uncomfortable. Some of the female teachers on the hall got together later that day and discussed how uneasy we all felt about what was transpiring with the new teacher and also with students. A fellow teacher decided to report the situation to Dr. Slater. I believe the report was made via email. She asked me (and other teachers) if she could include our names on the email to corroborate what had been happening. **Within days, Dr. Slater reached out to me. I reiterated the details listed above and agreed that things were uncomfortable on C Hall and reached a point where it felt like the rumors had some truth to them**…

(Doc. 56-7 (emphasis added); Doc. 56-3, 46:22-48:4). However, Slater did not report these allegations to Susan Goodin, the HR Director. (Doc. 56-3, 37:1-4). The other allegations that were reported to Slater as early as 2016-2019 included Bell asking a female teacher if she was "happy in [her] marriage with [her] husband" and

"constantly harassing her for her cell phone number." (Doc. 56-7; Doc. 56-2, 97:3-102:23). Confirming Bell's inappropriate behavior toward students, in 2018 a student named Katie Hart, a senior at the time, provided a written statement to Principal Slater about Bell giving her "hugs," asking her when whether she was going to live on her own or stay at home after graduation, telling her that she needed to live on her own, and telling her that when she graduates they could become Facebook friends and he would bring her food and get coffee together. (Doc. 56-8). Bell sat beside Hart and asked her when her birthday was and insisted on getting her an Apple Watch, telling her that he only "gets one for his favorites." (Doc. 56-8). Hart's statement concludes by staying "I spoke with Mr. Slater and he said he would take care of it." (Doc. 56-8). Again, however, Slater, who admits receiving Hart's statement, did not report these allegations to the central office. (Doc. 56-2, 112:17-113:4; Doc. 56-3, 37:1-4).

In 2020, prior to Plaintiff being employed at Wetumpka, Principal Slater claims that he warned Bell about "Unwelcomed / Inappropriate situations" including "making comments to teachers, touching teachers on the arm/shoulder, calling teachers to your office without good reason, doing multiple observations on particular teachers (8 on one teacher in a month), talking about texting outside of school, hanging out in teacher's room for long periods, Women/Girls visiting your office for no apparent reason for extended lengths of time", with Slater's writeups

including the following inappropriate comments attributed to Bell: "you look good today, you should dress like that more often"; "you can text me, my wife does not check my phone"; "you need to invite me to your house"; "you can come talk to me any time or text me on the weekend"; "It is my business if I cheat on my wife"; "come here, come closer so Mrs. Crownover can talk about us." (Doc. 56-9; Doc. 56-2, 37:13-53:5). Slater further warned Bell in 2020 that teachers were told "Do not go to his office alone, several teachers are uncomfortable coming to your office or going to you alone" and about "'checking out' teachers and students as they walk down the hall" and making females "nervous about wearing certain clothes to work." (Doc. 56-9).

Bell's response to these allegations was to tell Slater that "[t]he problem is a lot of the teachers here do not like taking authority from a black male." (Doc. 56-4, 225:22-226:5). After Bell blamed the sexual harassment allegations on racism, Slater did not discipline him, but merely told Bell, "We're just going to move on." (Doc. 56-2, 36:1-37:12; Doc. 56-4, 226:11-16). According to Bell, he and Slater "had no further conversations about it after that day." (Doc. 56-4, 226:14-16). In 2020, Slater instructed Bell "Do not meet with female teachers/students by yourself." (Doc. 56-9; Doc. 56-2, 53:2-14). The 2020 memo also notes that Slater had spoken to Bell previously "about the way he addresses Ms. Hall or other female teachers." (Doc. 56-9; Doc. 56-2, 53:15-21).

In 2021, Dr. Slater (after the initial warnings in 2020 about the inappropriate conduct referenced above) warned Bell a third time about his inappropriate behavior toward females in the workplace, this time instructing him to "limit his time behind closed doors with certain – with Ms. Fennell and, you know, women in general at work." (Doc. 56-10; Doc. 56-9; Doc. 49-19; Doc. 56-3, 73:4-17; Doc. 56-2, 72:8-19). In response, Bell again blamed the allegations on racism, pointing out that no one had previously raised issues about him spending time with the other assistant principal, Ms. Eutsey, who, like Bell, is African American: "I said, 'Ms. Eutsey has rubbed my back sitting in the commons before. No one has ever said anything about that. She's held my hand in the hallway. No one has ever said anything about that. Ms. Bell [sic] and I's relationship, no one has ever said anything about that.'" (Doc. 56-4, 231:8-19).

An investigation by Defendant's Human Resource Director Susanne Goodin revealed that "ten employees/students reported having been sexually harassed and placed in awkward interactions with" Assistant Principal Bell. (Doc. 56-10; Doc. 56-7; Doc. 56-12; Doc. 56-3, 30:21-31:6). According to Goodin's investigation, of those whom Bell had sexually harassed, "five of the employees and one student verbally reported the sexual harassment" directly to Dr. Robert Slater, the principal of Wetumpka High School. (Doc. 56-10; Doc. 56-3, 30:21-31:23). Slater confirmed that the allegations, if true, would constitute inappropriate or unprofessional conduct

and possibly sexual harassment. (Doc. 56-2, 82:4-18). Goodin likewise confirmed that the conduct attributed to Bell amounted to sexual harassment, and that she, as HR Director, would have recommended that Bell be disciplined if she had known. (Doc. 56-3, 64:16-65:12, 69:17-70:5). When asked, "have you had any other administrator that's had as many complaints of sexual harassment on them as Mr. Bell?" Goodin testified, "Not that I recall." (Doc. 56-3, 46:16-20). But Slater didn't discipline Bell or refer the matter to the central office but instead protected Bell by not reporting the allegations further up the chain of command. (Doc. 56-3, 65:1-66:1).

Showing that Bell was a widely known sexual harasser at the time Plaintiff was hired, Laura Dennis, the superintendent's daughter, was explicitly warned about Bell when she came to work for Defendant that year: "At the time that I was hired there, I didn't know anything besides just stay away from him." (Doc. 56-13, 18:12-19:3). Dennis understood this warning to mean "as a female, basically try not to be alone in the room with him, things like that." (Doc. 56-13, 20:16-21:2). Female teachers who had been harassed by Bell were so afraid of retaliation and so fearful of Bell that they refused to come forward with formal accusations against him, even though some teachers were so distressed by his conduct that they felt they needed to leave the school and seek other employment. (Doc. 56-3, 38:9-40:13; Doc. 56-14).

On April 6, 2022 Defendant notified Bell that it was seeking to terminate his employment. (Doc. 49-19). The notice references the prior warnings that Bell received in February and 2022 and September 1, 2021 regarding "complaints from female staff members" including "unwelcomed comments … about their body/appearance," touching, "perceived harassment by text," and "spending lengthy periods of time in your office with female students and/or female teachers for no apparent school-related reason." *Id.* After Bell's termination, he filed a Charge of Discrimination alleging race discrimination. (Doc. 56-15).

### F. **<u>Principal Slater Falsified a Document to Make it Appear Plaintiff Had Been Previously Warned About Being Alone with Bell</u>**.

Although Defendant contends that Plaintiff was previously warned about "hanging out behind closed doors for long periods of time" with Bell and told to "[l]imit the number of interactions that you are having behind closed doors" and to "[l]imit your number of interactions (within reason) to complete your job responsibilities," Plaintiff never behaved inappropriately and was never warned; at all times, Plaintiff's relationship with Bell remained completely professional. (Doc. 49-14; Doc. 56-1, 48:5-15, 89:21-90:9, 110:14-111:2). Defendant admits that Principal Slater's memorandum, Doc. 49-14, documenting an alleged prior warning to Plaintiff in September 2021, which Plaintiff had never seen, was a post-hoc compilation of alleged "notes" that do not presently exist, post-dated to make it seem like it had been created at the time of the alleged event, but that in truth, this

document did not exist prior to March 2022. (Doc. 56-10; Doc. 49-14; Doc. 56-3, 22:13-24:2, 223:2-18; Doc. 56-2, 63:4-64:18). Although the document sent to the EEOC and produced in discovery has a handwritten date of September 1, 2021, Slater created the document after "the whole situation happened," i.e. in March 2022. (Doc. 49-14; Doc. 56-2, 63:22-65:16). Goodin claims that Slater contacted her in the fall of 2021 and informed her that a teacher had reported seeing Plaintiff and Bell together in the teachers' workroom, and she instructed him to talk to them. (Doc. 56-3, 89:18-91:12). Contrary to Goodin's instructions, Slater never addressed these allegations with Plaintiff in 2021. (Doc. 56-1, 89:21-90:9). Rather, he spoke only to Bell, who explained to him, "Well, we're both coworkers. We're both assistant principals, so there are going to be times that we are going to work closely with each other." (Doc. 56-4, 229:8-231:19).

Defendant used Slater's fabricated memorandum as part of its justification for seeking Plaintiff's termination, confronting Plaintiff with it during a meeting with Dr. Slater and HR Director Goodin after Plaintiff's suspension. (Doc. 56-1, 110:13-111:2). Contrary to what the memo states, there had never been a previous occasion when Slater had warned Plaintiff about limiting her time behind closed doors with Bell; rather, Slater only spoke to Bell about limiting his time with Plaintiff. (Doc. 56-1, 112:22-113:7; Doc. 56-4, 229:8-231:19).

### G. Defendant Terminated Plaintiff Allegedly for Being in a "Compromising Position" Alone Behind Closed Doors with Bell.

According to Defendant's discovery response, its articulated reason for terminating Plaintiff is that she and Bell "were engaged in intimate, inappropriate behavior on school grounds during school hours…" (Doc. 56-16, pp. 3-4, Response to Interrogatory No. 3; Doc. 56-3, 121:22-122:19). "Intimate, inappropriate" refers to Plaintiff and Bell standing too close together behind closed doors. (Doc. 56-3, 124:15-23). Goodin testified that she concluded that Plaintiff and Bell were engaged in some sort of physical relationship "[b]ased on the two incidents of them being close together in two separate occasions where two separate teachers saw them in those compromising situations."[2] (Doc. 56-3, 80:3-15). However, Goodin conceded that her investigation uncovered no evidence that Plaintiff and Bell were touching, (Doc. 56-3, 220:4-17), only standing close together, and she testified, "what weighed heavily on me was the fact that she didn't go help with the fight." (Doc. 56-3, 81:20-82:2). This reason was not included either in Defendant's interrogatory response or in the log of disciplinary actions that Goodin kept. (Doc. 57-1; Doc. 56-3, 144:11-145:17).

---

[2] Following her termination, Plaintiff received a notification of proposed action from the Alabama Department of Education under Alabama Code §16-23-5(a), which states that the State Superintendent of Education may revoke a teaching certificate "when the holder has been guilty of immoral conduct or unbecoming or indecent behavior" and referencing Plaintiff's suspension "pending the investigation into your inappropriate relationship with a co-worker." (Doc. 56-11).

Because Superintendent Dennis's daughter was involved, he did not participate in any way in the investigation; after his daughter called him, Dennis told her, "Well, you need to report that to Slater, and he'll follow up with anybody like HR as necessary … That's who you need to go and see. You go meet with Mr. Slater, or Dr. Slater, and that's what you do." (Doc. 56-18, 90:7-14). After Laura Dennis reported the matter to Slater, Slater contacted HR; Dennis then had a conversation with Goodin in which he told her, "It was my daughter saying this, so I am totally out of the mix. You'll be carrying this one all by yourself." (Doc. 56-18, 90:7-23). By the time Goodin drafted the recommendations for termination for Bell and Plaintiff in April 2022, she had learned of Bell's history as a serial sexual harasser, including the complaints Slater had addressed with him in 2020. (Doc 49-19; Doc. 56-3, 95:9-96:18). In her investigation, Goodin also relied on the false memo from Slater purporting to show that he had previously warned Plaintiff, which Slater later confessed that he created in March 2022 in response to Goodin asking him for documentation showing that he'd warned Plaintiff, postdating it to falsely suggest she had been warned. (Doc. 49-14; Doc. 49-21; Doc. 56-3, 208:7-209:11, 224:4-225:11). Based entirely on Goodin's investigation, Dennis recommended the termination of both Plaintiff and Bell, and the School Board accepted the recommendation. (Doc. 56-18, 134:10-137:4, 138:15-19).

The incident with Plaintiff was not the sole grounds for Bell's termination; rather, Defendant also focused on Bell's history of sexual harassment allegations: "you know, it was a whole group of things to be involved in his termination. This [the past allegations of sexual harassment] could be part of it, but it's not the reason he was terminated." (Doc. 56-18, 66:17-67:8). Bell's insubordination in ignoring previous warnings (an opportunity not given to Plaintiff) was also one of the grounds accepted by the Board for his termination. (Doc. 56-4, 337:11-338:9). As to whether the "multiple reports of sexual harassment" formed part of the grounds for Bell's termination, Dennis testified, "[i]t's in the whole group as a whole. As far as the whole thing is looked at, yes." (Doc. 56-18, 67:9-16). "In terminating Bell, I looked at … all of the information that was provided in her [HR Director Goodin's] investigation as a whole." (Doc. 56-18, 71:12-22). However, as to Fennel and Bell, Dennis testified, "The main issue would be the compromised position they put themselves in that day at Wetumpka High School." (Doc. 56-18, 71:23-72:4).

School Board members focused on the simple fact of Bell being behind closed doors with a female administrator, with one Board member asking Slater, "Can you explain when it would be appropriate for two administrators to be together behind closed doors, a male and a female?" (Doc. 56-4, 68:4-17).

### H. <u>Defendant Did Not Terminate Males Accused of Similar Conduct</u>.

This is not the first time employees have placed themselves in a "compromising position." In 2018, Ken Burdett, a male teacher, approached Chad Walls, the principal of Redland Hills Elementary school, who is also male, and swiped his hand on a male administrator's buttocks while making reference to a "bromance" and asking him, "Debit or credit?" (Doc. 56-19). As a result of this behavior, Burdett received a two-day unpaid suspension. *Id.* at p. 3.

In October 2020, Jessica Minter accused Roman Zeigler, an Assistant Principal at Wetumpka High School, of sexual harassment by taking a furtive picture of her from behind, and when she turned around and caught him, saying something about "all of yall wearing jeans for homecoming week." (Doc. 56-20, pp. 2-3). Minter also reported that "he has insulted Ms. Brooks several times, not to me, but within earshot, in reference to the fact that women shouldn't be leading or in charge." *Id.* at p. 3. According to HR Director Goodin's writeup, along with the sexual harassment allegation, Zeigler had previously been accused of making "racially charged /gender biased comments around the school." *Id.* at p. 2. Further, "[t]he Principal, Shay Jackson, also reported difficulty keeping up with him and him reporting when needed. He seemed to be hidden some during the day and hard to find to help with matters." *Id.* Despite being dishonest, Zeigler received no discipline

other than a "letter documenting the complaint from the employee and some concerns that came with the situation." *Id.* at pp. 4-5.

**Scope of Review**

This Court reviews a district court's denial of summary judgment de novo, "construing the facts and all reasonable inferences from the facts in favor of the nonmoving party." *Stardust, 3007 LLC v. City of Brookhaven*, 899 F.3d 1164, 1170 (11th Cir. 2018).

## Summary of Argument

The plaintiff, Amanda Fennel, was a good employee who found herself in the wrong place at the wrong time with a known sexual harasser. For years, as allegations of sexual harassment continued to accrue against Assistant Principal Rahman Bell, the principal, Dr. Slater, protected Bell and did not escalate the reports to the central office. A reasonable jury could find, by contrast, that Slater reported Plaintiff to the central office the very first time she found herself in a situation that others claimed to view as compromising, resulting in her termination along with Bell, likely so that Defendant could rebut Bell's inevitable accusation of race discrimination by pointing to a white administrator, Plaintiff, whom it had fired for similar claimed reasons. In fact, it seems likely that Bell regarded Plaintiff as his next victim—but Plaintiff had no way of knowing this because Slater kept the sexual harassment complaints against him under wraps and allowed him to continue harassing women and girls. The trial court erred in failing to recognize that a reasonable jury could find that Plaintiff's female gender or her white race within the context of her association with Bell were motivating factors in her termination. This Court should reverse the judgment below and remand this case for a jury trial.

## **Argument and Citations to Authority**

### I. **The Court Should Erred in Granting Summary Judgment Under Plaintiff's Sex Discrimination Theory of Relief.**

The Court erred in granting summary judgment based on its rejection of Plaintiff's circumstantial evidence and its drawing of inferences against the Plaintiff. However, at the outset, the Court was correct in observing Plaintiff need not proceed under the *McDonnell Douglas* framework. (Doc. 59 at 8). This is because the only showing of causation that the statutory text requires, and the only burden plaintiffs face to establish liability at trial, is to show that "race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C.S. § 2000e-2. Applying the statutory text, the Eleventh Circuit has made clear that "under [the 1991] amendments, if the employee shows merely that race was a motivating factor, he has established liability and thus may be entitled to some relief. Whether the employer has met its 'same action' burden of proof would go to the nature of the relief available." *Hall v. Ala. Ass'n of Sch. Bds*., 326 F.3d 1157, 1165 (11th Cir. 2003). Although the Court recited the correct standard, the Court erred in applying that standard, as discussed below.

#### A. **A Reasonable Jury Could Find that Plaintiff's Sex Was at Least a Motivating Factor in Her Termination, Even if Other Factors Also Motivated that Decision**.

Plaintiff was terminated for allegedly being caught in a "compromised position" as a female administrator "together behind closed doors" with a male

colleague. (Doc. 56-4, 68:4-17; Doc. 56-16, pp. 3-4, Response to Interrogatory No. 3; Doc. 56-3, 121:22-122:19; Doc. 56-18, 71:23-72:4). Applying the statutory text under a "circumstantial mosaic" and "mixed motive" framework, Plaintiff's argument is straightforward: that a reasonable jury could find that Plaintiff's sex was at least "a motivating factor for [the termination of her employment], even though other factors" may have "also motivated [her termination]." 42 U.S.C.S. § 2000e-2. *See McCreight v. AuburnBank*, 117 F.4th 1322, 1335 (11th Cir. 2024) ("the convincing mosaic approach is—in its entirety—the summary judgment standard.")

Under such an approach, Plaintiff is not required to show pretext. "Requiring a plaintiff to negate the defendant's explanation on summary judgment has at least two defects. First, it is not required to succeed at trial. Second, it detracts from the plaintiff's affirmative case that the driving cause was illegal discrimination or retaliation." *Ismael v. Roundtree*, Case No. 24-10604, 2025 U.S. App. LEXIS 31896 at *15 (11th Cir. 2025). "If we require the plaintiff to negate their counterparty's rationale, we permit the absurd result of a plaintiff losing on summary judgment for failing to demonstrate a falsity that she would never need to show at trial." *Id*. at *15-16. Rather than a requirement for surviving summary judgment, evidence of pretext is merely "*a subset* of potentially relevant circumstantial evidence." *Id*. at *16 (emphasis in original).

Here, the Court erred in finding that Plaintiff's five categories of circumstantial evidence were insufficient for a reasonable jury to infer intentional sex discrimination. These include 1) decisionmakers' focus on Plaintiff's gender in her "compromised position" of being behind closed doors with a male administrator; 2) comparator evidence regarding Defendant's more favorable prior treatment of Bell; 3) evidence of other male comparators accused of inappropriate conduct who also received more lenient treatment; 4) non-comparator evidence of Defendant's tolerance of sexual harassment; and 5) evidence of pretext in Slater's fabrication of a memo to make it appear that Plaintiff, like Bell, had previously been warned, when in fact Slater had never previously spoken with Plaintiff about being alone with Bell.

**(1) A Reasonable Jury Could Infer Discrimination from Defendant's Focus on the "Compromised Position" of a Female Administrator Alone with a Male Colleague.**

From the mere situation—as the Superintendent put it, "the compromised position they put themselves in that day at Wetumpka High School"—and the fact that Bell and Plaintiff were observed spending time in close proximity in the past, Defendant claims to have drawn the conclusion that Plaintiff and Bell "were engaged in intimate, inappropriate behavior on school grounds during school hours…" (Doc. 56-16, pp. 3-4, Response to Interrogatory No. 3; Doc. 56-3, 121:22-122:19; Doc. 56-18, 71:23-72:4). However, contrary to the trial court's reasoning, a reasonable jury could find that Defendant's conclusion that Plaintiff had placed herself in a

"compromised position" by being alone with Bell was motivated by gender bias, as manifested in the Board's concerns about a male and a female administrator spending time together alone behind closed doors, along with other evidence overlooked by the trial court, including Bell's history of sexual harassment.

Addressing such evidence, the trial court erroneously concluded that it "shows that the Board's decision was motivated by Laura Dennis' observations and Superintendent Dennis' recommendation that Fennel and Bell should be terminated for their conduct at school." (Doc. 59 at 10). In so reasoning, the trial court made two crucial errors. First, it inappropriately weighed the evidence and drew inferences unfavorable to the plaintiff that a jury would not be required to draw. Second, by reframing the evidence and weighing it on the scales of Defendant's articulated reason for termination, the trial court committed the same error as the district court in *Ismael*: it "focused narrowly on the defendant's purported rationale and ignored the other evidence probative of Appellees' illicit intent," converting the "purported rationale" into a relevance standard and then using that standard to reject Plaintiff's evidence "unless it negated the proffered reason." 2025 U.S. App. LEXIS 31896 at *20.

For an administrator such as Plaintiff, a reasonable jury could find, contrary to the trial court's reasoning, that Defendant understood that doing Plaintiff's job required meeting behind closed doors with her male counterpart to discuss

confidential issues such as student discipline—and that this is what Plaintiff and Bell were doing before Plaintiff called his attention to the zipper, such that at all times, Plaintiff's relationship with Bell remained completely professional. (Doc. 49-14; Doc. 56-1, 48:5-15, 89:21-90:9, 110:14-111:2). Tellingly, during Bell's termination hearing, School Board members focused on the simple fact of Bell being behind closed doors with a female administrator, with one member asking Slater, "Can you explain when it would be appropriate for two administrators to be together behind closed doors, a male and a female?" (Doc. 56-4, 68:4-17). The trial court erroneously dismissed this statement as irrelevant by reasoning that ""[a]t most, the Board member's reference to the parties' sex … is a 'stray remark' largely unconnected to the decision-making process." (Doc. 59 at 11). Contrary to the trial court's reasoning, this statement was far from a "stray" remark, and it was hardly "unconnected to the decision-making process": rather, it was a fundamental question cutting to the heart of the articulated reason for terminating Plaintiff, raised on the record in the hearing where the Board was deliberating about that very situation.

The Court, in limiting its discussion of such evidence to the single statement made by a board member at the hearing, and viewing that evidence solely through the lens of the Defendant's articulated reason for termination, also overlooked that Slater's knowledge of Bell's history of sexual harassment in the workplace was relevant to explain why Defendant claims to have jumped to a conclusion that

Plaintiff, a female administrator, was engaged in "inappropriate conduct" with Bell. As stated above, Slater was the person who escalated this incident to the Central Office rather than handle it at the school level, as he'd done on each of the at least three previous occasions when female teachers and students had come to him with allegations of sexual harassment and inappropriate conduct against Bell. In this instance, unlike the previous occasions when he received reports about Bell engaging in sexually harassing behavior, Slater made the decision to refer the matter to HR Director Goodin at the central office. (Doc. 56-2, 131:12-134:24).

A reasonable jury could find that by 2022, Slater considered any occasion when Bell was alone with a woman to be suspect. HR Director Goodin was aware that Slater had instructed Bell to "limit his time behind closed doors with certain – with Ms. Fennell and, you know, women in general at work." (Doc. 56-10; Doc. 56-9; Doc. 49-19; Doc. 56-3, 73:4-17). A reasonable jury could therefore infer that Plaintiff's female gender made her automatically suspect in Goodin's eyes as well. In the words of Judge Gorsuch, "[i]f the employer intentionally relies in part on an individual employee's sex when deciding to discharge the employee—put differently, if changing the employee's sex would have yielded a different choice by the employer—a statutory violation has occurred." *Bostock v. Clayton Cty*., 590 U.S. 644, 656-60 (2020). Here, likewise, the jury could infer that but for Plaintiff's gender, Defendant would not have jumped to the conclusion that she was "engaged

in intimate, inappropriate behavior" with no evidence that she and Bell were even touching, such that if she were a man, Slater would not have escalated the issue to the central office and Defendant would not have terminated her employment. This evidence is reinforced by Slater's more favorable treatment of Bell, letting him run rampant and sexually harass at least ten women and girls prior without consequence, including engaging in public displays of sexual harassment in the halls. (Doc. 56-7). *See Jenkins v. Nell*, 26 F. 4th 1243, 1251 (11th Cir. 2022) (reasoning under the "circumstantial mosaic" theory that "[a]lthough Jones was not a strict comparator, the evidence that he threatened his supervisor, a Rule A-6 violation, and did not incur any additional warnings or discussion about his comments is relevant.")

**(2) A Reasonable Jury Could Find that Bell, Including as an Untenured Administrator, Received More Favorable Treatment Despite Repeatedly Engaging In "Intimate, Inappropriate Behavior" in the Workplace.**

Comparator evidence reinforces the inference of gender discrimination that arises from Defendant's view of Plaintiff and Bell being "together behind closed doors, a male and a female" as a "compromised position." (Doc. 56-4, 68:4-17; Doc. 56-18, 71:23-72:4). And, to the extent that Plaintiff is required to proceed under *McDonnell Douglas* (she is not), comparator evidence permits her to establish a prima facie case of discrimination and also constitutes substantial evidence of pretext. *See Lewis v. City of Union City*, 918 F.3d 1213, 1226 (11th Cir. 2019);

*Walker v. St. Joseph's/Candler Health Sys.*, 506 F. App'x 886, 889 (11th Cir. 2013) ("[a] typical means of establishing pretext is through comparator evidence.")

First, the trial court erred in concluding that Plaintiff could not rely on Bell as a comparator based on the repeated past incidents in which he engaged in sexual harassment without receiving discipline and without the matter being elevated for investigation to the Central Office. In rejecting Plaintiff's comparator evidence, the Court appears to have erroneously subjected that evidence to the "nearly identical" standard this Court rejected as "too strict" in *Lewis*. 918 F.3d at 1226 n.10.

The trial court appears to have correctly accepted that a reasonable jury could find that Bell's past conduct in the workplace, both before and after he became a tenured employee, amounted to "intimate, inappropriate behavior" and that Bell repeatedly placed himself (and his victims, including teachers as well as students) in "compromised" positions: the Court acknowledged that "[t]he record does reveal that Slater gave Bell multiple warnings after Bell repeatedly placed himself in compromised positions with other staff members and students" and that "Bell engaged in 'intimate, inappropriate behavior,' including making inappropriate comments to teachers, touching teachers on the arm and shoulder, and having women and girls visit his office for extended lengths of time without an apparent reason." (Doc. 59 at 12-13). The language used by the court is the same language that Defendant used to describe Plaintiff's alleged transgression, allowing a reasonable

jury to conclude that Bell and Plaintiff were similarly situated "in all material respects." *Lewis*, 918 F.3d at 1226 (emphasis added). A reasonable jury could further find that Slater's more favorable treatment of Bell supports an inference of gender discrimination; the trial court correctly determined that Slater had treated Bell more favorably than Plaintiff, in that Slater "did not refer Bell for discipline until the March 8, 2022 incident with Fennel; and that by contrast when Slater was confronted with evidence that Fennel placed herself in a 'compromised' position, he immediately reported the misconduct to Goodin and the Board." (Doc. 59 at 13).

The trial court erred in concluding, despite what the Court recognized as Slater's more favorable treatment of Bell for similar conduct, that a reasonable jury could not infer discrimination from this evidence, reasoning that "Slater's treatment of Bell's prior misconduct is not proper comparator evidence because it involved different kinds of misconduct" because "in none of those prior incidents was Bell observed adjusting his clothing after being discovered alone with a colleague behind closed doors." (Doc. 59 at 13). The trial court's focus on a minute detail such as Bell "adjusting his clothing" shows that the trial court's evaluation of Plaintiff's comparator evidence applied the "too strict" "nearly identical" standard. *Lewis*, 918 F.3d at 1226 n.10. Alternatively, the trial court failed to recognize that "comparator evidence can still be useful even when there are 'material differences' between a plaintiff and her comparator" and that "it is the jury's role—not ours—to determine

how much weight comparator evidence should be given." *Ismael*, 2025 U.S. App. LEXIS 31896 at *20 (11th Cir. December 5, 2025) (quoting *Tynes*, 88 F. 4th at 947).

The Court further erred in inappropriately drawing the key inference against the Plaintiff when it concluded that "when Bell was found alone with Fennel in his office, he was subject to the *same* discipline—termination—as Fennel for the same primary misconduct. Thus, Slater's treatment of Bell actually supports the Board's argument that Fennel's termination was *not* motivated by sex." (Doc. 59 at 13). In so reasoning, the trial court improperly usurped the jury's role "to determine how much weight comparator evidence should be given." *Id*. The trial court's reasoning further overlooks that in addition to Defendant's more favorable treatment of Bell in the past, Defendant had racially discriminatory reasons for treating Bell and Plaintiff the same on this occasion, as discussed later in this brief: Slater was concerned that Bell would claim race discrimination, giving Slater a motive to depict a white female as equally culpable. The trial court's reasoning further disregards that although both Bell and Plaintiff were terminated, a reasonable jury could nonetheless infer intentional discrimination on the basis of Plaintiff's gender and/or race based on Defendant (through Slater) treating Bell more favorably by allowing Bell to repeatedly harass women and girls without consequence.

To summarize the comparator evidence of Bell's conduct that the trial court rejected as irrelevant to Plaintiff's discrimination claims: Bell had been warned by

Principal Slater at least three times over a period of numerous years, going back to 2017 or even earlier, regarding his inappropriate, sexually harassing behavior toward women and girls in the workplace, including his behavior toward Plaintiff. (Doc. 56-10; Doc. 56-9; Doc. 49-19; Doc. 56-2, 53:15-21; Doc. 56-4, 229:8-231:19). Each time, despite being warned, Bell's sexually harassing behavior continued. By the time Plaintiff and Bell were terminated, Bell was a tenured employee. However, Slater learned about Bell's conduct during the 2017-2018 school year, when Bell, hired in 2015, was untenured, just like Plaintiff was in 2022.[3] A written statement from a former teacher (who left high school teaching to escape this environment) shows that in 2017, Slater learned that Bell was engaging in public displays of sexual harassment in the halls of the high school, including being extremely "touchy feely" with a young female teacher and inappropriately putting his hand in the hole in a female student's jeans above the thigh, to the extent that the female teachers on the hall "discussed how uneasy we all felt about what was transpiring with the new teacher and also with students." (Doc. 56-7). Defendant itself concluded that Slater had received this information and failed to act on it. (Doc. 56-10).

Showing the relevance of this evidence, the Court correctly recognized that a reasonable jury could find that these allegations would, if true, qualify as "intimate,

---

[3] Bell was first hired by Defendant for the 2015-2016 school year as a Special Education teacher. (Doc. 56-21; Doc. 56-4, 240:2-13). This means that he would first have been eligible for teacher tenure after three years, in the fall of the 2018-2019 school year. (Doc. 56-1, 100:7-10).

inappropriate" conduct by Bell; that such conduct, if true, would have placed Bell and the women and girls involved in a "compromised position"; and that Slater's decision not to escalate such allegations to the central office, while later choosing to report Plaintiff immediately to HR Director Goodin for finding herself in a similar "compromised position" with Bell in his office, constitutes disparate treatment. (Doc. 59 at 12-13). The Court erred in failing to recognize that from this disparate treatment, a reasonable jury could draw an inference of intentional discrimination.

Bell's comparable misconduct continued after he obtained teacher tenure. The "intimate, inappropriate behavior" that Bell repeatedly engaged in without consequence included placing female staff members in "Unwelcomed / Inappropriate situations" by "making comments to teachers, touching teachers on the arm/shoulder, calling teachers to your office without good reason, doing multiple observations on particular teachers (8 on one teacher in a month), talking about texting outside of school, hanging out in teacher's room for long periods, Women/Girls visiting your office for no apparent reason for extended lengths of time", with Slater's writeups including the following inappropriate comments attributed to Bell: "you look good today, you should dress like that more often"; "you can text me, my wife does not check my phone"; "you need to invite me to your house"; "you can come talk to me any time or text me on the weekend"; "It is my business if I cheat on my wife"; "come here, come closer so Mrs. Crownover can

talk about us." (Doc. 56-9; Doc. 56-2, 37:13-53:5). Bell's insubordination in ignoring previous warnings (an opportunity not given to Plaintiff) was one of the grounds accepted by the Board for his termination. (Doc. 56-4, 337:11-338:9).

Contrary to the trial court's reasoning, a reasonable jury could find that Bell's past conduct was sufficiently similar to what Defendant accused Plaintiff of for jurors to draw a meaningful comparison and to help infer intentional discrimination. In *Lewis*, the Eleventh Circuit rejected the "nearly identical" standard for comparator evidence and instead held that "a plaintiff proceeding under *McDonnell Douglas* must show that she and her comparators are "similarly situated in all material respects." 918 F.3d at 1226. The Eleventh Circuit went on to make clear that which "respects" will be considered "material" to the comparator analysis will vary depending on the particular circumstances: "precisely what sort of similarity the in 'all material respects' standard entails will have to be worked out on a case-by-case basis, in the context of individual circumstances." *Id.* at 1227 (emphasis added). Both before and after Bell earned tenure, Defendant subjected him and Plaintiff to the same policies regarding inappropriate behavior in the workplace, showing that Bell's tenured status is not "material" to the comparator analysis in this instance.[4]

[4] Defendant's employee handbook states "[t]he contents of this handbook apply to all regular employees (certified and classified) and to all part time, temporary, and seasonal personnel in the School System..." (Doc. 49-6, p. 3). Similarly, Defendant's Policy Manual does not differentiate between tenured or non-tenured employees in the application of its policies. (Doc. 56-5). Finally, Defendant's Administrative Roadmap makes no mention of tenured or non-tenured status being relevant to disciplinary decisions. (Doc. 56-6, pp. 12-13).

*See Lathem v. Dep't of Children & Youth Servs*., 172 F.3d 786, 793 (11th Cir. 1999) ("The relevant inquiry is not whether the employees hold the same job titles, but whether the employer subjected them to different employment policies.") And even if Bell is not deemed a "strict comparator," evidence of more favorable treatment is still relevant and admissible under the "mosaic" framework: "comparator evidence can still be useful even when there are 'material differences' between a plaintiff and her comparator." *Ismael*, 2025 U.S. App. LEXIS 31896 at *20; see also *Jenkins*, 26 F. 4th at 1251 (reasoning under the "circumstantial mosaic" theory that "[a]lthough Jones was not a strict comparator, the evidence that he threatened his supervisor, a Rule A-6 violation, and did not incur any additional warnings or discussion about his comments is relevant.") The Court erred in weighing this evidence and rejecting it.

Taking the facts in the light most reasonable to the Plaintiff, Defendant, after receiving shocking reports about Bell's conduct in the workplace, allowed Bell to remain employed for nearly four more years, with Slater never once making the decision to escalate the matter to the central office, while Bell continued repeatedly placing himself and others in "compromised positions" through episodes of "intimate, inappropriate behavior." By contrast, as the trial court recognized, Slater reported Plaintiff to the central office the very first time that such allegations arose without so much as giving her a warning that working closely with Bell could, in

Defendants' eyes, place her in a "compromised position." Contrary to the memo Slater fabricated in 2022 after Goodin asked for documentation that he had spoken to Plaintiff and Bell, Slater never warned Plaintiff about limiting her time behind closed doors with Bell; rather, Slater only spoke to Bell about limiting his time alone with Plaintiff, allowing a reasonable jury to infer that Slater believed Bell, not Plaintiff, was at fault. (Doc. 56-22; Doc. 56-1, 112:22-113:7; Doc. 56-4, 69:4-13; 229:8-231:19). Particularly in light of Defendant's failure to warn Plaintiff while repeatedly warning Bell and allowing him to remain employed both before and after he obtained teacher tenure, a reasonable jury could find that gender was at least a motivating factor in Defendant's more lenient treatment of Bell both before and after he received tenure. The trial court erred in concluding to the contrary.

In sum, a reasonable jury could therefore find that Slater subjected Plaintiff and Bell to disparate terms and conditions of employment, constituting actionable discrimination under *Muldrow v. City of St. Louis*, 601 U.S. 346, 350, (2024) and, based on comparator evidence, that Plaintiff's gender was at least a motivating factor in his actions. A reasonable jury could further find that Slater's biased actions, including the falsified memo, remained both a "but for" and a proximate cause of Plaintiff's termination, as Slater's decision to report Plaintiff to the central office led directly to her firing. *See Staub v. Proctor Hosp*., 562 U.S. 411, 419, 420 (2011).

**(3) <u>Plaintiff Has Identified Other Male Comparators Who Were Treated More Favorably</u>.**

The trial court also erred in concluding that a reasonable jury could not infer intentional discrimination based on evidence of additional male comparators who violated Defendant's professional conduct standard in the workplace by engaging in sexual harassment, placing themselves and others in compromised positions, but were treated more favorably, receiving no discipline or lesser discipline short of termination. These include Ken Burdett, a male teacher who swiped his hand on a male administrator's buttocks while making reference to a "bromance" and asked him, "Debit or credit?" (Doc. 56-19). As a result of this behavior, Burdett received only a two-day unpaid suspension. *Id.* at p. 3. Roman Zeigler, a male assistant principal, was accused of taking a picture of a female employee from behind and, when confronted with his behavior, making a comment about "all of yall wearing jeans for homecoming week." (Doc. 56-20 pp. 2-3). Even though Zeigler was dishonest in his self-justifications and had a past history of making "racially charged /gender biased comments around the school," Zeigler received no discipline. *Id.* A reasonable jury could further find that Zeigler is also an appropriate comparator as to the allegation that Plaintiff was terminated for delaying responding to the fight, as Goodin's writeup states "[t]he Principal, Shay Jackson, also reported difficulty keeping up with him and him reporting when needed. He seemed to be hidden some during the day and hard to find to help with matters." *Id.* at p. 2. Contrary to the trial

court's reasoning, a reasonable jury could consider Defendant's more lenient treatment of the above two male individuals, one of them an assistant principal, as additional circumstantial evidence giving rise to an inference of intentional discrimination. *See Jenkins*, 26 F. 4th at 1251 (reasoning under the "circumstantial mosaic" theory that "[a]lthough Jones was not a strict comparator, the evidence that he threatened his supervisor, a Rule A-6 violation, and did not incur any additional warnings or discussion about his comments is relevant").

**(4) <u>A Reasonable Jury Could Infer Discriminatory Intent from Defendant's Tolerance of Sexual Harassment</u>.**

In addition to its relevance as comparator evidence, evidence of Defendant's lenient treatment of other workplace sexual harassers—especially Slater's decision to let Bell run rampant and sexually harass at least ten women and girls for years without consequence, including permitting him to engage in public displays of sexual harassment in the halls so egregious that they led at least one former teacher to abandon high school teaching—is also independently relevant for the non-comparator purpose of showing discriminatory intent based on Slater's tolerance of sexual harassment in the workplace. Showing the relevance of such evidence, the Eleventh Circuit has found that the employer's failure to take complaints of sexual harassment seriously can show discriminatory intent. *See, e.g.*, *Smith v. City of New Smyrna Bea*ch, 588 F. App'x 965, 976 (11th Cir. 2014) (evidence of sex discrimination includes "the lack of seriousness with which superiors took

complaints of sex discrimination.") As stated above, an investigation by Defendant's Human Resource Director Susanne Goodin revealed that "ten employees/students reported having been sexually harassed and placed in awkward interactions with" Assistant Principal Bell without Bell facing discipline, with Slater failing to act on these reports. (Doc. 56-10; Doc. 56-7; Doc. 56-12; Doc. 56-3, 30:21-31:6).

Contrary to the trial court's reasoning that "Goodin and the Board were unaware of the prior allegations made by students and teachers against Bell until after Goodin began her investigation of the March 8, 2022 incident" (Doc. 59 at 15), Bell's sexually harassing conduct was clearly known to Slater, who was responsible for reporting Plaintiff to the central office and thus caused her termination. Bell's reputation as a sexual harasser was so widespread in the school that Laura Dennis, the superintendent's daughter, was explicitly warned to "stay away from him" when she came to work for Defendant. (Doc. 56-13, 18:12-19:3). In a memo that Principal Slater wrote about his claimed 2020 warning to Bell, two years before the events of this case, Slater claims to have instructed him, "Do not meet with female teachers/students by yourself." (Doc. 56-9). Prior to the events at issue in this case, HR Director Goodin was also aware that Slater had instructed Bell to "limit his time behind closed doors with certain – with Ms. Fennell and, you know, women in general at work." (Doc. 56-10; Doc. 56-9; Doc. 49-19; Doc. 56-3, 73:4-17). Again, contrary to the trial court's exclusive focus on Goodin and the Board, Slater's

tolerance of Bell's sexual harassment of women and girls in the workplace supports an inference of sex discrimination, as a reasonable jury could find that Slater used Goodin and the Board as a "cat's paw" to cause Plaintiff's termination, treating her more harshly than Bell. *See Staub v. Proctor Hosp*., 562 U.S. 411, 419, 420 (2011).

**(5) <u>A Reasonable Jury Could Infer Gender Discrimination from the Evidence of Pretext In Principal Slater's Fabrication of a Memo to Make it Appear that Plaintiff Had Been Warned about Bell</u>.**

Finally, the Court erred in rejecting Plaintiff's evidence of pretext, which constitutes relevant additional circumstantial evidence reinforcing the other circumstantial evidence of sex discrimination discussed above. Again, Plaintiff does not concede that the *McDonnell Douglas* framework controls this case; rather, the Eleventh Circuit has made clear that evidence of pretext is simply relevant circumstantial evidence supporting an inference of discrimination. "Regardless of the term used—'pretext,' 'convincing mosaic,' 'summary judgment'—the substance of the argument is the same." *McCreight*, 117 F.4th at 1336. *See also Reeves v. Sanderson Plumbing Prods*., 530 U.S. 133, 147 (2000) ("Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive.")

Here, the trial court inappropriately rejected Plaintiff's evidence of pretext, reasoning "[a]ssuming the falsity of Slater's statement about their September 2021 discussion, it does not sufficiently suggest pretext, if at all … here, Fennel does not

dispute the *substance* of the reason cited by the Board for her termination—that she was seen alone with Bell in close physical proximity in the teacher's lounge in September 2021…" (Doc. 59 at 15). This passage shows that the trial court committed the same error as the trial court in *Ismael*: evaluating the Plaintiff's proffered evidence and "rejecting it unless it 'negated the proffered reason' for [her] termination." 2025 U.S. App. LEXIS 31896 at *20. Here, the trial court rejected Plaintiff's evidence of pretext because in the trial court's view it did not negate "the substance of the reason cited by the Board." (Doc. 59 at 15). This was error, showing that the trial court inappropriately dismissed Plaintiff's case "for failing to demonstrate a falsity that she would not need to show at trial." *Id.* at *15-16.

Defendant admits that Principal Slater's memorandum, Doc. 49-14, documenting an alleged prior warning to Plaintiff in September 2021 about "hanging out behind closed doors for long periods of time" with Bell and directing her to "[l]imit the number of interactions that you are having behind closed doors" and to "[l]imit your number of interactions (within reason) to complete your job responsibilities," was a compilation of alleged "notes" that do not presently exist, and which Plaintiff had never seen, post-dated by Slater to create the false appearance that Plaintiff had been warned in 2021, and that the falsified document did not exist prior to March 2022. (Doc. 56-10; Doc. 49-14; Doc. 56-3, 22:13-24:2; 223:2-18; Doc. 56-2, 63:4-64:18; Doc. 56-1, 48:5-15, 89:21-90:9, 110:14-111:2).

Allowing an inference of pretext, contrary to what the memo states, Slater had never warned Plaintiff about limiting her time behind closed doors with Bell; rather, Slater only spoke to Bell about limiting his time with Plaintiff. (Doc. 56-1, 112:22-113:7; Doc. 56-4, 229:8-231:19). The memo thus gives the false impression that Plaintiff had intentionally disobeyed previous directives to "[l]imit the number of interactions that you are having behind closed doors" and to "[l]imit your number of interactions (within reason) to complete your job responsibilities," and that Plaintiff had been made aware of "perception of staff … that your interactions are not professional in nature." (Doc. 49-14).

The trial court failed to address the inference of discrimination that arises from Slater's falsification of this memo and failed to recognize that these inferences support triable issues of fact as to Slater's discriminatory intent. Contrary to Goodin's instructions, Slater never addressed such allegations with Plaintiff in 2021, but spoke only to Bell, allowing a reasonable jury to infer that Slater believed that Bell, not Plaintiff, was at fault; Slater's decision not to address the matter with Plaintiff supports an inference that he knew that Plaintiff was the innocent party in their interactions. (Doc. 56-1, 89:21-90:9; Doc. 56-4, 229:8-231:19). The trial court's opinion failed to address this key inference raised by the plaintiff. A reasonable jury could further find that in later fabricating the memo and falsifying it to state that he had spoken with Plaintiff, Slater knowingly sought to recast Plaintiff

after the fact as a willing participant in an illicit affair, rather than an innocent victim of Bell's habitual inappropriate behavior. The trial court's dismissal of such evidence shows that it committed the same error as the district court in *Ismael*: it "focused narrowly on the defendant's purported rationale and ignored the other evidence probative of Appellees' illicit intent." 2025 U.S. App. LEXIS 31896 at *19-20. The trial court should have recognized that a reasonable jury could infer such intent from Slater's falsification of the memo to make Plaintiff appear equally culpable to Bell simply because she was a female behind closed doors with a male administrator.

A reasonable jury could also find that Defendant relied on Slater's fabricated memorandum as part of its justification for seeking Plaintiff's termination, as Dr. Slater and HR Director Goodin confronted Plaintiff with it during a meeting after Plaintiff's suspension, and the superintendent relied entirely on Goodin's investigation in recommending Plaintiff's termination. (Doc. 56-1, 110:13-111:2; Doc. 56-18, 90:7-23). A reasonable jury could further find that the false impressions created by the fabricated memo were material to the decision to terminate Plaintiff's employment, especially in light of evidence that Slater had repeatedly protected Bell from the consequences of much more severe allegations of unprofessional conduct, including while Bell was an untenured administrator. Accordingly, the trial court erred in rejecting Plaintiff's evidence of pretext.

### B. **The Court Erred in Granting Summary Judgment on Plaintiff's Race Association Theory of Relief.**

At the outset, the trial court correctly rejected Defendant's argument that Plaintiff could not maintain an associational race discrimination claim because she denied the existence of any personal or romantic relationship with Bell, reasoning that "[t]he Board's interpretation is too narrow" and that "other courts have recognized Title VII claims premised upon casual social relationships." (Doc. 59 at 16). This reasoning was correct, as *Parr v. Woodmen of the Life Insurance Co*. establishes that the nature of the relationship is not what matters in determining whether an associational plaintiff is a member of the protected class. Rather, "[w]here a plaintiff claims discrimination based upon an interracial marriage or association, he alleges, by definition, that he has been discriminated against because of his race." 791 F.2d 888, 892 (11th Cir. 1986) (emphasis in the original). Showing that *Parr*'s holding is not limited to romantic or familial relationships, the Court in *Parr* approved the reasoning of *Whitney v. Greater New York Corporation of Seventh Day Adventists*, 401 F. Supp. 1363 (S.D.N.Y. 1975), where, as the Eleventh Circuit explained, "a white woman claimed that she was discharged in violation of Title VII because she maintained a social relationship with a black man." *Parr*, 791 F.2d at 891. In *Whitney* the relationship in question was not romantic or familial in nature, but rather a "casual social relationship." 401 F. Supp. at 1365. After reciting both the facts of *Whitney* and its holding, the Eleventh Circuit declared, "We, too, find

*Whitney*'s logic irrefutable." *Id.* at 892. Accordingly, the key for evaluating an associational race claim is to determine whether the plaintiff's race matters to the theory of discrimination, not the nature of the alleged relationship. *See Joseph v. Bd. of Regents of the Univ. Sys. of Ga.*, 121 F.4th 855, 871 (11th Cir. 2024) ("[i]n other words, claims based on interracial association necessarily implicate the race of both the complainant and the associate. So, any discrimination based on that association is based on the race (or sex or religion or national origin) of both parties.") Here, as in *Whitney* and *Parr*, a reasonable jury could find that Plaintiff was discriminated against because of her race in the context of her close working relationship with Bell.

The trial court erred, however, by failing to recognize that in addition to the categories of circumstantial evidence discussed above, which support an inference of race discrimination based on Slater's more favorable treatment of Bell and his fabrication of a memo to falsely impute culpability on Plaintiff, a reasonable jury could further infer intent to discriminate against Plaintiff because of her race within the context of her working relationship with Bell from two additional categories of circumstantial evidence: Slater's clear incentive to terminate a white employee at the same time he terminated Bell, and evidence of his more favorable treatment of the other assistant principal, Ms. Eutsy, who is African American.

First, the trial court was wrong to label inferences regarding Slater's motive to avoid accusations of race discrimination as "speculation." (Doc. 59 at 18). Rather,

as discussed above, the evidence before the trial court showed that on the past occasions when Slater had warned Bell, Bell had protested that he was being singled out because of his race; each time when Bell raised allegations of race discrimination, Slater promptly backed down. After Bell blamed the 2020 sexual harassment allegations on racism, Slater did not discipline him, but merely told Bell, "[w]e're just going to move on," allowing a reasonable jury to infer that Slater did not discipline Bell because he was concerned about being accused of racism, i.e. because of Bell's African American race. (Doc. 56-2, 36:1-37:12; Doc. 56-4, 226:11-16). Similarly, in 2021, Slater spoke to Bell about spending time alone with Plaintiff. (Doc. 56-10; Doc. 56-9; Doc. 49-19; Doc. 56-3, 73:4-17; Doc. 56-2, 72:8-19).

Again, as discussed above, Slater's failure to speak with Plaintiff, as he later falsely claimed to have done, is evidence that Slater believed that Bell was the sole party at fault in the situation. In response to Slater telling Bell to "limit his time behind closed doors with certain – with Ms. Fennell and, you know, women in general at work," Bell again blamed racism, pointing out that no had previously raised issues about him spending time with the other assistant principal, Ms. Eutsey, who, like Bell, is African American: "I said, 'Ms. Eutsey has rubbed my back sitting in the commons before. No one has ever said anything about that. She's held my hand in the hallway. No one has ever said anything about that. Ms. Bell [sic] and I's relationship, no one has ever said anything about that.'" (Doc. 56-4, 231:8-19). From

this evidence, a reasonable jury could conclude, as in *Smith v. Lockheed-Martin Corp.*, that to avoid Bell's inevitable claim of racism, Slater "had incentive" to accuse a white employee of similar alleged misconduct at the same time as Bell, causing Slater to go so far as to fabricate a memo to make Plaintiff appear culpable. 644 F.3d 1321, 1344 (11th Cir. 2011) (reasoning that "[t]he inference that Mitten's termination was the result of Heiserman's racial animus toward whites is bolstered further by evidence that Heiserman, during the summer of 2005, had incentive to fire white employees, but not black employees, who engaged in racially discriminatory conduct.") Here, as in *Smith*, a reasonable jury could thus find that Plaintiff's race in the context of her association with Bell motivated her termination.

The other category of additional evidence inappropriately rejected by the trial court on the race association claim includes comparator evidence regarding Bell's inappropriate behavior with the other African American assistant principal, Ms. Eutsey. In 2020, Bell told Slater, "Ms. Eutsey has rubbed my back sitting in the commons before. No one has ever said anything about that. She's held my hand in the hallway. No one has ever said anything about that. Ms. Bell and I's relationship, no one has ever said anything about that." (Doc. 56-4, 231:8-19). Contrary to the trial court's reasoning, Defendant's failure to discipline Ms. Eutsey for engaging in such conduct with Bell further supports an inference that Plaintiff's race in the context of her close working relationship with her African American assistant

principal colleague was at least a motivating factor in her firing. *See Lewis*, 918 F.3d at 1226; *Jenkins*, 26 F. 4th at 1251 (reasoning under the "circumstantial mosaic" theory that "[a]lthough Jones was not a strict comparator, the evidence that he threatened his supervisor, a Rule A-6 violation, and did not incur any additional warnings or discussion about his comments is relevant.") Eutsy is also a comparator because she and Plaintiff arrived at the fight at the same time; if Plaintiff was dilatory, then so was she. (Doc. 56-1, 85:2-86:1; 188:22-189:10; 191:7-14).

## CONCLUSION

Based on the above arguments, authorities, and evidence, the trial court's judgment should be reversed, and this case should be remanded for a jury trial.

Respectfully submitted,

/s/ L. William Smith
Jon C. Goldfarb
L. William Smith
Counsel for Plaintiff-Appellant

## Certificate Of Compliance

I certify that this brief complies with the type-volume limitation set forth in Fed. R. App. P. (32)(a)(7)(B). This brief contains 12,682 words according to the word-count function of the word-processing system used to prepare the brief.

/s/ L. William Smith
Attorney for Plaintiff-Appellant

**OF COUNSEL:**
WIGGINS, CHILDS, PANTAZIS, FISHER,
& GOLDFARB, LLC.
The Kress Building
301 19th Street North
Birmingham, Alabama 35203
Telephone No.: (205) 314-0500

## Certificate of Service

I hereby certify that a true and correct copy of the above and foregoing document was served via the Eleventh Circuit's electronic filing system to all counsel of record on the 15th day of December, 2025.

/s/ L. William Smith
OF COUNSEL